# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 25, 2011 Session

## STATE OF TENNESSEE v. CLAYTON PIKE, JR.

**Direct Appeal from the Criminal Court for Polk County**
**No. 08-132      Amy A. Reedy, Judge**

**No. E2010-01463-CCA-R3-CD - Filed May 16, 2012**

A Polk County Criminal Court Jury convicted the appellant, Clayton Pike, Jr., of first degree premeditated murder and misdemeanor reckless endangerment, and the trial court sentenced him to concurrent sentences of life and eleven months, twenty-nine days, respectively. On appeal, the appellant contends that (1) the trial court should have granted his motion to suppress evidence because the search of his home was unlawful, (2) the evidence is insufficient to support the murder conviction, and (3) the trial court committed reversible error by failing to instruct the jury that it could not consider the appellant's prior bad acts as substantive evidence. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by denying the appellant's motion to suppress but that the error was harmless. Therefore, the appellant's convictions are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined. JERRY L. SMITH, J., not participating.

Philip L. Duval (on appeal) and Charles Richard Hughes, Jr., and Larry D. Wright (at trial), Cleveland, Tennessee, for the appellant, Clayton Pike, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Robert Steven Bebb, District Attorney General; and M. Drew Robinson and Stephen Hatchett, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In October 2008, the Polk County Grand Jury indicted the appellant for the first degree premeditated murder of "the victim," Steven Gargala, and the attempted first degree murder of Craig Crawford. At trial, twenty-three-year-old Anthony Brazier testified that he was the victim's stepson and that the victim was married to Brazier's mother, Caroline. On the evening of June 27, 2008, Brazier went to the Gargalas' home in Delano. The victim; Mrs. Gargala; and Brazier's uncle, Crawford, were also at the home. Brazier said that his mother, the victim, and Crawford were drinking alcohol and that everyone was "shooting the breeze, and hanging out." About 9:00 p.m., they decided to ride all-terrain vehicles (ATVs). Brazier, with Mrs. Gargala as his passenger, drove a Kawasaki four-wheeler, and the victim, with Crawford his passenger, drove an Arctic Cat Prowler. Brazier described the Prowler as "set up like a golf cart."

Brazier testified that they left before dark but that his four-wheeler's headlight was turned on. He said that he was "pretty sure" the Prowler's headlights were not turned on but that "[y]ou could still see without headlights." The ATVs pulled out of the Gargalas' driveway and onto Chestuee Road. Brazier said they traveled down the road to a bridge, turned around, and drove back toward the Gargalas' home. When they got close to the house, they turned around, returned to the bridge, turned around, and headed toward the Gargalas' home. Brazier's four-wheeler was behind the Prowler. Brazier said they never left the county road and never drove onto the appellant's property.

Brazier testified that at as they were traveling toward the Gargalas' home for the second time, they met the appellant as he was driving around a blind curve. Brazier said the appellant forced their ATVs toward the ditch and had a "pistol stuck out the window." The victim stopped the Prowler, and the appellant stopped his Ford Explorer. The vehicles were beside each other but facing opposite directions. Brazier said that he was stopped five to seven feet behind the Prowler and that the victim "said a few words" to the appellant. However, Brazier could not hear what was said due to the noise of the ATVs. Brazier said the victim picked up a gun and told the appellant, "'I have one too.'" The victim either put the gun down or dropped it, grabbed the appellant's gun with his left hand, and held the gun against the frame of the Explorer. Brazier said that the victim pushed the gun into the appellant's face and "took off." The appellant leaned out of the Explorer and fired two shots directly at the victim. The Prowler traveled around the curve, and Brazier lost sight of it.

Brazier testified that he did not realize the victim had been shot and drove to the Prowler, which had turned over. Crawford was crawling out of the ATV, and Brazier tried to help the victim. He said that the appellant pulled up to the Prowler, stopped, and asked, "'What do you reckon caused him to wreck?'" Brazier said he told the appellant, "'Dude, you shot him in the [f***ing] back.'" He said that the appellant was acting oblivious to what was happening and that the appellant tried to help him get the victim out from underneath the

Prowler. Brazier checked the victim for a pulse but could not find one. He raised the victim's shirt and saw a hole by the victim's left shoulder blade. When the appellant saw the hole, he got into his Explorer and left. Brazier's mother was hysterical and used a cellular telephone to call 911. At some point, the appellant returned to the scene. Brazier said the appellant told them, "[M]ove the beer bottles and liquor bottles, the cops are on their way, I called the cops and told them that he was drunk and he wrecked his four wheeler." Brazier said that no beer or liquor bottles had been in the Prowler and that "to my knowledge anything that was in that ditch had been thrown out the window." The appellant gave Brazier a rag to put over the hole in the victim's back. Brazier said the appellant looked down at the victim and stated, "'Heh-heh, you got what you deserved, you son-of-a-bitch[.]'" Then the appellant turned around and walked away.

On cross-examination, Brazier testified that he took a gun to the victim's house that evening and showed it to the victim. He said that the victim owned guns and that it was not unusual for the victim to carry a gun on a ride "in case you see a snake, coyote." The appellant also lived on Chestuee Road, and two or three houses separated the Gargalas' home from the appellant's home. The distance between the Gargalas' home and the bridge was about one and one-half miles, and the appellant's house was the last house the ATVs passed before they got to the bridge.

Brazier testified that he saw the victim consume "a few beers" that night but that he did not know if the victim had consumed alcohol before he arrived at the Gargalas' home. He said that earlier in evening, his mother had mentioned that the appellant "may have pulled a pistol" on Brazier's cousin. Brazier said that when they first encountered the appellant on June 27, the appellant was driving in the middle of the road and veered toward them. The victim stopped the Prowler, and the appellant pulled up beside him. Brazier acknowledged that he gave a statement in the early morning hours of June 28, 2008, and that he told the police he stopped the four-wheeler about twenty-five feet behind the Prowler. He explained, "I mean it could have been [7 feet], it could have been 15, I'm not exactly sure." He acknowledged that the victim's and the appellant's left arms were toward each other and that the men were arguing. The victim raised his gun into the air but did not point it at the appellant. The victim put his gun down, raised his left hand, grabbed the barrel of the appellant's gun, and pushed the gun against the frame of the appellant's Explorer. Then the victim pushed the gun into the appellant's face and fled. The appellant leaned his upper body out of the Explorer and shot at the victim. Brazier said he was "scared to death" and could not say how long the confrontation lasted. However, he acknowledged that the entire incident occurred within "a split second."

Brazier testified that when the appellant arrived at the scene of the wrecked Prowler, the appellant's face was bleeding from "a small little old abrasion." Brazier acknowledged

-3-

that the appellant offered to help the victim and that Mrs. Gargala was cursing the appellant. The appellant left the scene but returned with a rag. The appellant did not help Brazier apply pressure to the victim's wound but stayed until an ambulance arrived. The appellant's daughter also arrived. Brazier said that he had never seen the appellant before June 27, 2008, and that he had never had any problems with the appellant.

On redirect examination, Brazier testified that when the Prowler flipped over, Crawford hit his head and "was basically unconscious . . . he didn't know what was going on." Crawford had a knot about the size of a baseball on his forehead, and his hand was split open. Brazier said that Chestuee Road was a gravel road, that they were not racing the ATVs, and that they were not traveling fast enough for the gravel dust to bother his eyes.

Caroline Gargala testified that at the time of the victim's death, they had been married eighteen years. On the night of June 27, 2008, Mrs. Gargala was at home with her son, Anthony Brazier; brother-in-law, Craig Crawford; and some other relatives. The victim got home from work about 7:00 or 8:00 p.m., and Mrs. Gargala fixed dinner. She estimated that she drank five or six beers and that the victim drank six or seven beers. Crawford also consumed beer. The victim suggested that some of them go for a ride on ATVs. The victim and Crawford got into the Prowler, which the victim was driving, and Brazier and Mrs. Gargala got onto Brazier's four-wheeler, which Brazier was driving. The victim took Brazier's gun with him. Mrs. Gargala said they drove the ATVs on Chestuee Road to the "creek bridge" and back home. Then they returned to the bridge, turned around, and headed toward the Gargalas' home again. Mrs. Gargala said they "had rode down that road a thousand times" before. As they were returning to the Gargalas' home, they met the appellant, who blocked the road with his vehicle. Mrs. Gargala heard gunshots and saw the victim wreck the Prowler. When Brazier and Mrs. Gargala got to the Prowler, she saw that the victim had blood coming out of his mouth and was gurgling. She said that the appellant arrived and that she told him, "'[Y]ou've killed my husband . . . for riding a four wheeler.'" She said the appellant stated, "'He got what he deserved.'"

On cross-examination, Mrs. Gargala testified that everyone was "just having a good time" that night and that they did not discuss the appellant. She said that the ride was supposed to be "just a quick little spin" to the bridge and back and that the victim took a gun with him "in case we seen snakes or something." She said that as the ATVs approached the appellant's vehicle, the victim stopped the Prowler and Brazier stopped the four-wheeler "way back." Mrs. Gargala said she could not hear what the victim and the appellant were saying but that she "knew it wasn't real good." She said that she saw the appellant "stick his gun out the window," that she started to panic, and that she saw the victim "do something." However, she did not know if he grabbed the appellant's gun. She said that the Prowler "took off" and flipped over and that the appellant arrived at the scene of the wreck. She

stated that the appellant "barely touched" the victim's throat and that the appellant said the victim had a pulse. The victim was lying on his back and was trapped under the Prowler, and Mrs. Gargala did not know where he had been shot. She called 911 and did not remember the appellant's helping move the Prowler off the victim.

Craig Crawford testified that he was Carolina Gargala's former brother-in-law. On June 27, 2008, he and his daughter arrived at the Gargalas' home about 6:30 p.m. About 9:30 p.m., Crawford, the victim, Mrs. Gargala, and Brazier went for a ride on ATVs. Brazier and Mrs. Gargala were on a four-wheeler, and Crawford and the victim were in a Prowler. They drove about two miles to a bridge, turned around, and headed back toward the Gargalas' home. Crawford said the victim always had a gun with him and took a gun on the ride. Crawford did not know the appellant or where he lived.

Crawford testified that as they were riding back to the Gargalas' house, he saw the appellant's vehicle parked at an angle in the road. Crawford said that the victim, who was driving the Prowler, stopped beside the appellant's vehicle and that the victim asked the appellant "what his problem was." The appellant told the victim that the ATVs were on his property, and the victim told the appellant that Chestuee Road was a public road. Crawford said that "some words were exchanged" and that the appellant pulled out a gun. Crawford said that the victim picked up his gun and told the appellant, "'You are not going to shoot nobody, I've got a gun too.'" The victim put the gun down and never pointed it at the appellant. Crawford saw the appellant's thumb move backward and assumed the appellant was cocking his gun. Crawford said the victim grabbed the appellant's gun, "shoved it to the side," and punched the appellant in the jaw. Crawford said that the victim told him to "'hang on tight,'" that he was scared, and that the Prowler "[sped] off." The Prowler veered to the right, veered to the left, hit an embankment, and flipped.

Crawford testified that he hit his head and had a gash in his hand. After releasing his seatbelt, he and Brazier got the victim out from under the Prowler. He said that the appellant arrived and that Mrs. Gargala told the appellant, "'You shot my husband.'" Mrs. Gargala and Brazier rolled the victim over and showed the appellant the bullet hole in the victim's back. Crawford said the appellant touched the victim's neck and said, "'The bastard got what he deserved.'" Crawford said he talked to an agent with the Tennessee Bureau of Investigation (TBI) in the early morning hours of June 28, 2008, and that he remembered "saying certain things but I'm not going to 100 percent."

On cross-examination, Crawford testified that he had consumed two or three beers and that the victim and Mrs. Gargala also had consumed beer. He said he did not remember telling the TBI agent that "the plan was to come down on the four wheeler and prove that nobody could tell him what to do." He said that he had a "pump-knot on [his] head that was

really pounding" and that he was still bleeding when he gave his statement. He said that he held the victim's gun during the ride and that the victim carried a gun "anytime he went four wheeling or anything, went to a store." When the victim saw the appellant stopped in the road, the victim asked Crawford for the gun. Crawford said that the appellant kept telling the victim that "'[y]ou are on my G.D. property'" and that the victim told the appellant, "'This is a public road . . . and anybody can go up and down this road.'" Crawford said both men were cursing and "having words back and forth." The appellant's gun barrel was pointed out of the Explorer's window, and the victim showed his gun to the appellant. However, neither man threatened to fire his weapon. Crawford said that the victim grabbed the appellant's gun, "knocked it to the side," and "with [his right] hand he came back and popped [the appellant] in the chin." Then the Prowler sped away and wrecked. Crawford and Brazier lifted the Prowler, and Mrs. Gargala pulled the victim out from under it. Crawford said he never heard a gunshot.

The defense played Crawford's audio-recorded statement to the TBI for the jury. According to the statement, Crawford did not see the appellant with a gun and did not know why the appellant had a bloody nose after the incident. When asked if he heard a gunshot, Crawford said he heard a "pop" before the Prowler "took off."

Officer Matthew Price of the Polk County Sheriff's Department testified that on the night of June 27, 2008, he was dispatched to Chestuee Road for a possible shooting. He said that he and Deputy Josh Stroud arrived twelve to fourteen minutes later and that they secured the scene, which was "chaotic." He said that people were "everywhere," that some people were screaming, and that some people were mad. After the officers secured the scene, they helped an ambulance crew get to the victim, who was lying in a ditch in front of an ATV. Officer Price said that the officers then "put our emphasis on . . . locating the weapon so that no one else was injured by that weapon." Officer Price spoke with the appellant's daughter, who gave him permission to go with her to the appellant's house and told him that the gun would most likely be there. He said that "it was my impression that she lived there" and that he was concerned children in the home would find the gun. The appellant's daughter gave him permission to search the house and said the gun may be in a bedroom. Officer Price said that he and the appellant's daughter went into a bedroom and that the mattress "didn't look right." He said that he lifted the edge of the mattress and that the gun was lying "right there in easy access of the children." The gun was in a holster, and Officer Price collected the weapon.

On cross-examination, Officer Price testified that when he and Deputy Stroud arrived, they learned the appellant was the shooter and detained him. Officer Price did not speak with the appellant's wife, and he did not remember the appellant's daughter mentioning the appellant's wife. The driveway of the appellant's home was about thirty to forty feet from

-6-

the scene of the shooting, and the appellant's house was within walking distance. Officer Price acknowledged that when he searched the appellant's house and found the gun, an adult male was in the home with the children.

Detective Dennis Waters of the Polk County Sheriff's Department testified that he learned about the shooting at 10:00 p.m. and went to the scene. An officer told him the shooter was in a patrol car. Detective Waters went to the car and read Miranda warnings to the appellant. Detective Waters said the appellant stated that he "just heard a loud boom" and that he "didn't get hit." Detective Waters learned Officer Price had the murder weapon and went to the appellant's residence. Officer Price was on the porch and was holding a .357 Magnum revolver. Detective Waters put the gun into the trunk of his patrol car. The next day, he returned to the scene to look for evidence in the daylight and take photographs. He said that he saw skidmarks on the road and that the marks belonged to the appellant's Explorer and the victim's Prowler. Detective Waters said the appellant claimed that the ATVs had been "up and down his driveway." However, Detective Waters found no tire marks in the driveway.

On cross-examination, Detective Waters testified the appellant had a cut on his nose and that the cut was bleeding. The detective spoke with the appellant's daughter, and she confirmed that she gave Officer Price permission to go into the appellant's residence. When Detective Waters arrived at the appellant's house, he and Officer Price returned the gun to its original location under the mattress in order for Detective Waters to photograph it. He stated that "[u]nder normal circumstances," he preferred to photograph a weapon before it was moved. Later, Detective Waters learned a nine millimeter handgun also could be in the home. He returned to the house and retrieved the gun, which was hidden in the top of a closet.

Dr. Amy McMaster, a forensic pathologist, testified that she performed the victim's autopsy. The victim had a gunshot wound to the torso. The bullet entered the left side of his back and traveled back to front, left to right, and slightly upward. The bullet penetrated the victim's left lung, right lung, aorta, esophagus, and ribs. Dr. McMaster recovered a bullet and bullet fragments from the right side of the victim's chest. She said that the victim's blood alcohol level was .235, three times the legal limit for driving, and that she considered him to be intoxicated. She found no soot or stippling on the entrance wound, meaning either that the gun was more than a couple of feet away when it was fired or that something was between the gun and the victim's skin. She said that the cause of death was a gunshot wound to the chest and that the manner of death was homicide.

Special Agent Don Carmen of the TBI testified as an expert in firearms identification that he examined the appellant's .357 Magnum revolver, four .357 cartridges, two .357 spent

cases, the bullet recovered from the victim, and the victim's shirt. Agent Carmen concluded that the bullet removed from the victim was fired from the appellant's gun. The victim's shirt had gunpowder particles on it, indicating that the gun was within five feet of the victim when it was fired.

Detective Kevin Cole of the Polk County Sheriff's Department testified that he was the lead investigator for the case and arrived at the scene about 11:45 p.m. on June 27, 2008. The appellant was complaining about a laceration on his nose and not feeling well, so Detective Cole had paramedics examine him. The appellant consented to a toxicology test to check his blood for alcohol and narcotics, and Detective Cole had him transported to the police department. Detective Cole looked for evidence at the scene and found a .38 Special in the ditch. There were no spent casings in the gun. A large amount of blood was on the back of the Prowler's driver's seat, and Detective Cole took possession of the appellant's gun from Detective Waters. He later delivered all of the evidence, including the victim's shirt, to the TBI.

Detective Cole testified that he returned to the police department in the early morning hours of June 28 and spoke with the appellant. The appellant waived his rights and gave an audio-recorded statement, which the State played for the jury. During the then forty-five-year-old appellant's interview, he stated the following: The appellant had complained previously about the victim's "going down on our property . . . drunker than hell and four wheeling up and down our hill down there." About three months before the shooting, the appellant spoke with the victim about the situation. The victim had not been drinking and was nice. However, the victim's "nephew and them" continued to drive their four-wheelers "back and forth . . . till 12:00 at night." At first, the appellant claimed that on the night of the shooting, he walked down to the road to talk with the victim. The victim pulled a gun on the appellant, Crawford took the gun away from the victim, and the victim "took off real fast." The appellant heard gunfire, and the Prowler flipped over.

Later during the interview, the appellant changed his story and told Detective Cole the following: The appellant was at home and heard the four-wheelers on Chestuee Road. The victim fired a gun toward the appellant's house. The appellant got his revolver, went onto the porch, and fired two shots into the air. He thought one of the bullets struck the victim.

Finally, the appellant gave a third account of shooting. He said that the Gargalas were riding by his house, that they were "making all kinds of noise," and that Brazier "did come to the house and shoot up my way first." The appellant left his home and drove to Chestuee Road to talk with them. The victim was "very drunk," hit the appellant in the face, and "took off." The appellant "just whipped around" and fired two shots at the victim. He stated that he did not aim and that "it was very much an accident that I hit him." He said the victim "did

-8-

come up and pick on me and I do definitely feel that I had to protect myself." He said that he was scared and mad when he shot the victim and that he lied earlier during the interview because he was scared for his wife and family. He stated that he did not want to kill anyone but that "I sure was pissed when I got hit and it hurt real bad." The appellant denied that he had ever used a gun previously to threaten someone on Chestuee Road. The State rested its case.

Susan Pike testified for the appellant that she and the appellant had been married seven and one-half years at the time of trial. They moved into a trailer on Chestuee Road in 2003. At the time of the shooting, the appellant was not working and was disabled due to back and heart surgery. She said that he also suffered from panic attacks and took numerous medications but that he was a "[v]ery gentle, a very kind person." The Pikes' son, Kevin, and their granddaughter, who was eight years old at the time of trial, lived with them. Between 6:00 and 7:00 p.m. on June 27, 2008, Mrs. Pike's daughter, Kelly Shumate, arrived at the Pikes' home with Shumate's husband and son. Shumate and her husband were going to sleep for a while and then leave with her two children for a trip to Florida. About 9:00 p.m., the appellant went outside. Mrs. Pike said the appellant came inside and told her that he was going "down the hill." She said that he did not tell her why he was going but that she "assumed there was someone down [there]." A short time later, the appellant returned to the trailer and told his wife to call 911. She told him to call and handed him the telephone. She said that the appellant was "bleeding profusely" and that he told her "Gargala" hit him in the nose with a gun. He did not tell her that he had shot someone, and he was not excited.

Mrs. Pike testified that the appellant gave his gun to her and told her to put it away. The appellant usually kept the gun in the top of a closet. However, Mrs. Pike could not reach the top of the closet, so she put the gun under the mattress. She and Shumate wiped blood off the appellant, and the appellant and Shumate left in the appellant's Explorer. Mrs. Pike said that at some point, Shumate telephoned and told her that "'you need to come down here, they are arresting daddy.'" Mrs. Pike drove Shumate's car to the scene of the shooting. The police would not let Mrs. Pike speak with the appellant, so she sat in Shumate's car. She said that she kept asking the police if she could make sure the appellant had his diabetes medication but that they said no. She said that she never heard gunshots and that no one asked for consent to search her home.

Mrs. Pike testified about an incident that occurred two to four weeks before the shooting. She said that about midnight, four people were riding two four-wheelers "down there." The Pikes' dogs were barking continually, and Mrs. Pike and the appellant could not sleep. She and the appellant drove to Chestuee Road. The appellant was wearing his robe and pajama pants and got out of the car. She said the riders were "right in front of our driveway" and claimed to be related to Steven and Caroline Gargala. The appellant was

holding a gun but did not point it at them. She said the appellant did not argue with the riders but told them "to please not run up and down through there and to leave."

Mrs. Pike testified that in a second incident, Blake Burris was "way in on our property" by the creek. She said that her dogs were "going crazy as usual" and that she and the appellant drove to the creek. When they got there, they got out of their vehicle. She said Burris "took off in his truck," almost hitting her. Mrs. Pike and the appellant got back into their vehicle and followed Burris. The appellant fired a gunshot into the creek-bank in an attempt to get Burris to stop and talk with him. Instead, Burris drove home. When Burris and the appellant got to Burris' home, the appellant got out of his vehicle. He had a gun and talked with Burris. Mrs. Pike said that although "no trespassing" signs were posted on their property, people dumped trash and hunted there.

On cross-examination, Mrs. Pike testified that after the appellant talked with Burris, Burris and the appellant shook hands. She did not remember the appellant's pointing his gun at Burris. She said that "the Gargalas were constantly on that road, or at least Steven Gargala was."

Kelly Shumate, Susan Pike's daughter and the appellant's stepdaughter, testified that she used to live with the Pikes. However, at the time of the shooting, she lived in Cookeville. About 7:00 p.m. on June 27, 2008, Shumate, her husband, and her son stopped by her parents' home to pick up her daughter. Shumate and her husband planned to sleep for a while and leave for Florida about midnight. Shumate was sleeping in her parents' bedroom and was awakened by a gunshot. Her stepfather came into the bedroom and turned on the light. Shumate said that his nose was "gashed open" and that he had blood all over his shirt. She said he was calm, was not mad or upset, and "was like in shock I guess." She asked him what had happened, and he told her that someone had hit him. The appellant telephoned 911, but Shumate did not hear what he said during the call.

Shumate testified that she and her mother cleaned up the appellant. Then Shumate and the appellant went to Chestuee Road. They approached the victim, and the appellant told Shumate to get something out of the car so he could apply pressure to the victim's wound. Shumate got a towel and gave it to the appellant. She said that the victim was lying on his back and that the appellant used the towel to apply pressure to the victim's gunshot wound. Shumate said Caroline Gargala was upset and told her, "'I wish your daddy was dead.'" She said the police arrived and asked the appellant about the location of the gun. Shumate did not hear what the appellant told them, and the police handcuffed him. Shumate telephoned her mother and told her to come to the scene. Shumate said that the police asked her about a gun and that she told them that "'there's guns in the house.'" She and an officer went to the Pikes' trailer and went into her parents' bedroom. The officer searched the room but did

not find anything, so he went into her brother's bedroom. The officer returned to her parents' room and found the gun under the mattress. Shumate said that the police knew she was the appellant's daughter but that she told them she did not live there.

Shumate testified that sometime in 2006, while she still lived with her parents, some people drove a truck into the "pull-in" by the creek. Shumate said she and the appellant "went down there and he just told them to get off his property." She said that the appellant did not have a gun and that the incident ended "very nicely."

On cross-examination, Shumate acknowledged that the sound of ATVs did not wake her on June 27. When the appellant came into the bedroom and turned on the light, Shumate did not see a gun. She also did not see anyone put a gun under the mattress. She said the appellant was able to apply pressure to the victim's wound because "[t]hey had tilted him sideways I believe."

Kevin Pike, the appellant's son, testified that he lived with his parents on Chestuee Road in June 2008 but was at work on the night of the shooting. He said that people would "'mud'" in the "pull-off" by the creek, tear up the ground, and dump trash. He said people also rode four-wheelers up the Pikes' driveway.

The appellant testified that his father and stepmother owned about eighteen acres on Chestuee Road. The appellant and his wife had lived in a trailer on the property for about seven years. When they first moved onto the property, Kelly Shumate lived with them. However, at the time of the shooting, Shumate lived in Crossville, near Cookeville. The appellant's trailer was a couple thousand feet from the road, and it was visible from the road in the winter.

The appellant testified that he previously had had problems with people four-wheeling and "mudding near the creek." He explained that one time, he saw Blake Burris and another boy "'mudding'" with a pickup truck. The appellant said Burris saw him and "shot off and hit the road." The appellant fired a gunshot, trying to get Burris to pull over and talk with him. Instead, the gunshot scared Burris, and Burris drove to his house. The appellant followed him. Burris got out of his truck, and the appellant got out of his car. The appellant had a gun and told Burris, "'What about not going down there and tearing up the place anymore?'" Burris told the appellant that Burris was not the only person "'down there that does it.'" The appellant answered, "'Well, we will try to go ahead and take care of the rest of them and get them out of there too.'" The appellant described a second incident that occurred a couple of weeks before the victim was killed. The appellant said he heard someone "run up and down the road a couple of times." He said he left his house and saw a man and a woman "on our property right there along the edge." He said that he pulled up

beside them and that "we discussed it and stuff." He said, "They told me that they was going to be kin to Steven Gargala by, I don't know, marriage or what." He said that he had his .357 Magnum revolver with him and that he was sure the couple saw it because "I had it on the dash there when I was talking to him." The man and woman were very respectful, and the appellant never saw them again.

The appellant testified that he had met the victim once or twice before June 27, 2008. In one incident about six months before the victim's death, the victim was driving back and forth on Chestuee Road about 8:00 p.m. The appellant said he went to the road and told the victim, who was intoxicated, "not to be coming down there and throwing his junk and stuff out." He said that the victim had been "'[s]hooting and carrying on'" and that the victim had a reputation for being "a hot-head and a big drinker." The appellant did not see the victim again until the night of the shooting.

The appellant testified that about 9:00 p.m. on June 27, 2008, he heard a couple of four-wheelers pass by his house at least five or six times. At some point, the appellant heard two gunshots near the gate of his driveway. Later, the appellant heard gunshots fired at his trailer. He left his house, drove down his driveway, and turned onto Chestuee Road. He said he took his loaded gun with him because "there ain't no telling what kind of people I'm going to run up on." The appellant saw the Prowler and stopped, and the victim pulled up beside him. The appellant said that he asked the victim if the victim had been shooting and that the victim said, "'Well, it wasn't nobody's damn business no way.'" The victim was intoxicated, could hardly talk, and smelled of alcohol. The appellant said he told the victim to "try and stay out of the damn road or quit shooting up towards the house."

The appellant testified that the victim was holding a gun in his right hand and "shaking it around," so the appellant picked up his gun. The appellant pointed it at the victim, but it was not cocked. Crawford took the victim's gun away from him, and the victim pushed the appellant's gun into the appellant's face, hitting the appellant in the nose. The appellant said that he heard the Prowler drive away and that "it was just reaction time, I think I just raised up and fired." He said that he thought he fired only one shot, that the victim was two to three feet away, and that he did not shoot at Crawford. After the shooting, the appellant drove to the Prowler and helped Crawford get the victim out from under the ATV. He said he did not remember saying that the "bastard got what he deserved." The appellant said he went home and told his wife to take the gun and "put it up." He also told his wife to call 911. However, she refused to call, so he called 911. Afterward, the appellant and his daughter returned to the Prowler. The appellant's daughter got a rag out of the appellant's Explorer, and the appellant pressed it onto the victim's gunshot wound.

The appellant testified that at the time of the shooting, he was taking several

medications for diabetes, heart problems, back pain, and anxiety. He said that he had taken his "nighttime medication" before the shooting and that "I don't want to use medication as an excuse, no. There wasn't really no excuse for what happened." He said that he had wanted to scare the victim's family away and that his scare tactic had worked previously. He said, "If I had it to do over I would have damn well stayed at the house, called the cops and that would have been the end of it." He acknowledged that Chestuee Road was a public road and said, "[Y]eah, I was wrong there."

On cross-examination, the appellant maintained that the victim fired two shots at his house on June 27 and that the victim's family rode their ATVs up his driveway. The appellant acknowledged that he shot the victim in the back. He also acknowledged that firing a gunshot at Burris in an attempt to get Burris to stop and talk did not "make any sense."

Blake Burris testified on rebuttal for the State that he lived on Chestuee Road and that the appellant "[lived] right down the road from me." About four years before trial, Burris was driving on the edge of a creek. He said that he did not know the appellant owned the property and that the appellant was parked on another road, watching the area. The appellant chased Burris back to Burris' house. Burris said that when he got home, he confronted the appellant and asked him "what the problem was." Burris said the appellant told him that "I was his problem." The appellant pulled out a gun, pointed it at him, and cocked the gun. Burris was scared and apologized to the appellant, but he did not shake the appellant's hand. Burris said that a couple of months later, he was "just riding around in the country" when the appellant "pulled out" behind him. Burris said he heard a couple of gunshots and "took off." He said that he either "lost" the appellant or that the appellant quit chasing him.

On cross-examination, Burris testified that he was still in school at the time of the first incident and that he was "pretty sure" his mother filed a complaint. He said that the appellant had a double action revolver during the first incident and that he "really didn't know" the appellant at the time. During the second incident, Burris did not see the appellant and did not see the appellant fire a gun. However, he saw the appellant's vehicle.

Bobby Long, Jr., testified on rebuttal for the State that his wife was the victim's niece and Craig Crawford's daughter. About two weeks before the victim was killed, Long and his wife were visiting the Gargalas and were riding a four-wheeler on Chestuee Road about 11:00 p.m. Long said that he and his wife had "[j]ust [gone] up and down the road . . . to the bridge and back" and that they did not leave the road. Long saw headlights come out of the appellant's driveway, and Long slowed down. The appellant said something to Long, so Long turned off the four-wheeler. The appellant got out of his vehicle, and a friend of Long's wife pulled up on another four-wheeler. The appellant approached the three of them with a gun. Long said that he and his wife's friend "[tried] to calm the situation down" and

that his wife's friend "stuck her hand out to introduce herself." The appellant uncocked his gun and shook her hand. Long said he became afraid because "it wasn't like it was a scare tactic. I mean he could have easily shot any of us."

On cross-examination, Long testified that he and his wife told the victim about the incident. Long did not know if his wife told Crawford about it.

The jury convicted the appellant of the first degree premeditated murder of the victim. Regarding Craig Crawford, the jury convicted the appellant of misdemeanor reckless endangerment as a lesser-included offense of attempted first degree murder. The trial court sentenced him to concurrent sentences of life for the murder conviction and eleven months, twenty-nine days for the reckless endangerment conviction.

## II. Analysis

### A. Motion to Suppress

The appellant claims that the trial court should have granted his motion to suppress evidence because the warrantless search of his home was unlawful. Specifically, he argues that Officer Price's finding the murder weapon under the mattress was the result of an illegal search because Kelly Shumate did not reside in the home and had no authority to consent to the search. The State argues for the first time on appeal that Shumate had the authority to give consent because she was an overnight guest in the home. We conclude that the trial court erred by denying the motion to suppress but that the error was harmless.

Before trial, the appellant filed a motion to suppress the gun found in his home because the evidence was obtained as the result of an illegal search. At the suppression hearing, Officer Price testified that when he arrived at the scene of the shooting on June 27, 2008, the appellant and his daughter, Kelly Shumate, were present. Officer Price put the appellant into a patrol car and attempted to locate the murder weapon. He said Shumate told him that the appellant "did leave with a weapon towards the house and that he did shortly thereafter return back to the scene without the weapon." Officer Price asked Shumate what persons were in the home, and she told him some small children and other people were there. Officer Price said that he asked Shumate if he could go to the home "to find the weapon and secure it, to preserve the evidence" and that Shumate went with him to the house. Officer Price entered the home and found the gun under a mattress. He left, encountered Detective Waters in the driveway, and gave the gun to the detective.

On cross-examination, Officer Price testified that he asked the appellant about the location of the weapon but did not ask the appellant for consent to search the home. He said

that he did not know the location of the appellant's wife and that he "didn't know who lived there other than the defendant." Officer Price asked bystanders at the scene if an immediate family member was present and learned Shumate was there. Shumate told the officer that the gun had been taken to the house. He said that he did not ask Shumate if she lived in the home but that he was "under the impression" she lived there. Later, Officer Price learned she did not live there. Officer Price said he had been at the scene of the shooting for only three or four minutes when he and Shumate went to the appellant's home. He said that some small children were in the residence, that he wanted to secure the weapon "to where nobody else could get hurt by [it]," and that he "didn't want anybody else to get in contact with that weapon and accidentally have a discharge."

Detective Waters testified that when he arrived at the scene, he learned Officer Price had gone to the appellant's home. Detective Waters walked to the house and saw Officer Price and Shumate walking down the driveway. Officer Price was holding a gun and said he thought it was the one used in the shooting. Detective Waters and Officer Price took the gun into the house, put it back where Officer Price had found it, and photographed it. Later, Detective Waters learned about another gun in the home. He returned to the residence and retrieved the second gun.

On cross-examination, Detective Waters testified that the appellant's son and two or three small children were in the home. Detective Waters did not know the appellant's wife and assumed she was at the scene of the shooting. He never asked the appellant to search the home but asked Shumate if she had given Officer Price permission to search it. Detective Waters said Shumate told him that "she lived there sometimes, she lived, I thought she said Meigs County. Sometimes she was there, sometimes she was in Meigs County." He said she also told him that the shooting "was going to make her forfeit going to Florida."

Susan Pike testified that on June 27, 2008, she and the appellant lived in a trailer on Chestuee Road with their son and granddaughter. Mrs. Pike's daughter, Kelly Shumate, had lived with them two or three years before the shooting. However, at the time of the shooting, Shumate lived in Cookeville. On the afternoon of the shooting, Shumate, her husband, and her son arrived at the Pikes' home. Mrs. Pike said, "They were staying there and getting some food before they went to Florida." After the shooting, Shumate called Mrs. Pike and asked her to come to the scene of the shooting. Mrs. Pike had her son-in-law babysit Shumate's two children while she went to Chestuee Road. A police officer asked Mrs. Pike if she was present at the time of the shooting, but no officers asked to search her home.

On cross-examination, Mrs. Pike testified that she first learned something had happened on Chestuee Road when the appellant returned home and told her to call 911. She told him to call, but she was in another room when the appellant telephoned 911. She said

he gave her his gun and told her, "Put this away so the kids don't get it." She said that she could not reach the top of the closet, where the gun was usually kept, so she put the gun under the mattress. She did not hide the gun. About ten minutes later, the appellant and Shumate went to Chestuee Road. Later, Mrs. Pike also went to Chestuee Road. She said that she was there for a long time but that she did not know when Shumate and Officer Price went to her house to search for the appellant's revolver.

At the conclusion of the proof, the State argued that exigent circumstances, created by the appellant's hiding the gun, justified the search. Specifically, the State argued that only two officers were initially present to secure the scene of the shooting and the scene at the appellant's home. The State also argued that the presence of children in the home "gave Officer Price the duty as a matter of fact to go in there and find that weapon before someone got hurt with it." The defense argued that the mere presence of children did not qualify as exigent circumstances that would have prevented the police from securing the scene while they obtained a search warrant. The trial court accredited the testimony of all the witnesses and denied the motion to suppress, stating as follows:

> [T]his is a consent issue, . . . so the question becomes two-fold: did the person that gave consent, was it a third party in fact with common authority or would a reasonable person, given the facts and circumstances available to the police, have concluded the consenting party had authority over the premises. Based on the testimony we have here today anyone in their position would have concluded that the daughter staying in the home had authority to give the consent, and in fact the mother that testified here corroborated what the officer said when he said as he understood they were going to Florida for a trip. How did he know they were on their way from somewhere else? They were going to Florida for a trip, which corroborates that he was acting as a reasonable person would act in assuming that she had the authority to give that consent, which is as you say one of the narrowly defined exceptions to the warrant requirement[.]

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence

adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The appellant asserts that the police did not have valid consent to search his home. Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). Our supreme court has said, "It is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). Generally, consent may be given "either by the individual whose property is searched or by a third party who possesses common authority over the premises." State v. Ellis, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000) (citations omitted). Common authority is the "mutual use of the property by persons generally having joint access or control for most purposes." United States v. Matlock, 415 U.S. 164, 171 n.7 (1974). The State may also establish common authority "by demonstrating that the facts available to the searching police officers would have warranted 'a man of reasonable caution in the belief' that the consenting party had authority over the premises." Ellis, 89 S.W.3d at 593 (quoting Illinois v. Rodriguez, 497 U.S. 177, 188-89 (1990)).

"The sufficiency of consent depends largely upon the facts and circumstances in a particular case." State v. Jackson, 889 S.W.2d 219, 221 (Tenn. 2003). The prosecution bears the burden of proving valid consent. See State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). Furthermore, "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting McMahan, 650 S.W.2d at 386).

The trial court concluded that Officer Price reasonably believed Shumate could consent to the search. We disagree with the trial court. Officer Price testified that when he arrived at the scene of the shooting, he learned the murder weapon was in the appellant's home. Officer Price also testified that he "didn't know who lived there other than the defendant." The officer asked bystanders if any of the appellant's immediate family members were present and learned the appellant's stepdaughter, Shumate, was there. He did not ask her if she lived in the home. Although he stated that he was "under the impression she lived there," he offered no explanation for what gave him that impression. Therefore,

the State failed to show that Officer Price reasonably believed Shumate had authority to consent to the search.

We note that Detective Waters testified that Shumate told him "she lived there sometimes." However, the State presented no evidence that Shumate was living in the home on June 27, 2008. To the contrary, Susan Pike testified that her daughter was living in Cookeville at the time of the shooting, had arrived that afternoon, and was visiting while on her way to Florida. The trial court specifically accredited Mrs. Pike's testimony. At trial, Mrs. Pike testified that Shumate and Shumate's husband were going to sleep for a while before leaving for Florida with the children. Shumate testified that she and her husband planned to leave at midnight and that she slept in her parents' bedroom. Therefore, nothing indicates that she was living in the appellant's home or was, as the State contends, an overnight guest at the time of the shooting. See Minnesota v. Olson, 495 U.S. 91, 98 (1990) (stating that an overnight guest has a legitimate expectation of privacy in the premises and, therefore, may also consent to a search). We conclude that the trial court erred by denying the appellant's motion to suppress.

Having determined that the trial court erred by denying the motion, we must now decide the effect of the error. In conducting harmless error analysis, our supreme court has identified three categories of errors: (1) structural constitutional error; (2) non-structural constitutional error, and (3) non-constitutional error. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008); State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003); State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000); State v. Harris, 989 S.W.2d 307, 314-15 (Tenn. 1999).

Structural constitutional errors involve "defects in the trial mechanism" that "compromise the integrity of the judicial process itself." Rodriguez, 254 S.W.3d at 371. Structural constitutional errors "have an impact upon '[t]he entire conduct of trial from beginning to end'" and require automatic reversal. Momon v. State, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting Arizona v. Fulminante, 499 U.S. 279, 311 (1991)). The denial of the right to counsel, denial of the right to self-representation at trial, denial of the right to a jury trial, and racial discrimination in grand jury selection are examples of structural constitutional errors. Rodriguez, 254 S.W.3d at 371; Momon, 18 S.W.3d at 165-66.

Constitutional errors that are not structural do not require automatic reversal. "However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Rodriguez, 254 S.W.3d at 371. The test to be applied is """whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.""" Id. (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002) (quoting Neder

v. United States, 527 U.S. 1, 15 (1999))). For non-constitutional errors, a defendant challenging a conviction has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); Rodriguez, 254 S.W.3d at 371-72. Appellate courts consider the entire record in evaluating whether the error affected the outcome of the trial. Rodriguez, 254 S.W.3d at 371-72.

The trial court's admitting the evidence recovered from an illegal search of the appellant's home is a non-structural constitutional error. Therefore, the State has the burden of proving beyond a reasonable doubt that the error did not contribute to the appellant's conviction. In our view, the State has met its burden. The evidence overwhelmingly showed that the appellant shot the victim in the back after the victim hit the appellant in the face. The ultimate question in this case was not whether the appellant shot the victim but whether he did so intentionally and with premeditation. We are convinced that the erroneously admitted gun and testimony about the gun had no impact on the jury's verdict. Accordingly, the appellant is not entitled to relief on this issue.

### B. Prior Incidents

Next, the appellant contends that the trial court committed reversible error by failing to instruct the jury that it could not consider the appellant's prior incidents with Burris and Long as substantive evidence. The State argues that the appellant is not entitled to relief because he failed to request a special instruction on substantive evidence. We conclude that the testimony presented by the State was proper rebuttal evidence and that the appellant is not entitled to relief.

After the appellant testified, the defense rested its case-in-chief. The State asked to call Burris and Long as rebuttal witnesses, arguing that the defense had put the appellant's character at issue when his wife testified that he was a very gentle man. The State also argued that the testimony was necessary to rebut the appellant's testimony about the incidents with Burris and Long and to show that the appellant initiated the contact with the victim and Crawford. Finally, the State argued that the evidence was admissible pursuant to Tennessee Rule of Evidence 404(b) to show the appellant's intent and refute his claim that he shot the victim in self-defense. The trial court ruled that the evidence was admissible under Rule 404(b), Tennessee Rules of Evidence, to show the appellant's motive and intent and that the danger of unfair prejudice did not outweigh the evidence's probative value. The trial court also ruled that the evidence was admissible to rebut the appellant's testimony about the prior incidents with Burris and Long.

"Rebuttal evidence is "any competent evidence which explains or is in direct reply to

or a contradiction of material evidence introduced by the accused.'" State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). Questions regarding the admissibility of rebuttal evidence are left to the sound discretion of the trial court and will only be overturned if the court has clearly abused its discretion. Id.

Burris' and Long's rebuttal testimony was proper because the appellant and his wife testified about the prior incidents with the two men, clearly opening the door to the evidence. The appellant has not cited to any authority that would have prohibited the jury from relying on the rebuttal proof as substantive evidence. See State v. Dellinger, 79 S.W.3d 458, 497 (Tenn. 2002) (noting that the defendant "failed to provide a specific explanation for why this instruction should have been given"). Moreover, as noted by the State, the appellant did not request a special instruction regarding the rebuttal testimony. See Tenn. R. Evid 105 (stating that "[w]hen evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"). Therefore, he is not entitled to relief.

## C. Sufficiency of the Evidence

Finally, the appellant claims that the evidence is insufficient to support the murder conviction because the State failed to prove that he intended to kill the victim or acted with premeditation. Instead, he argues that the evidence shows he acted recklessly or in the heat of passion. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a). Tennessee Code Annotated section 39-13-202(d) defines "premeditation" as "an act done after the exercise of reflection and judgment."

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

Taken in the light most favorable to the State, the evidence shows that on the night of the shooting, the appellant confronted the victim on Chestuee Road. The appellant claimed that the victim's ATV was on his property and pointed a loaded gun at the victim. Crawford testified that he saw the appellant's thumb move backward, cocking the gun. The victim pushed the appellant's gun into the appellant's face, cutting his nose, and sped away. The appellant was angry, leaned out of the Explorer, and shot at the fleeing victim. After the shooting, the appellant drove to the wrecked ATV. When Brazier and Mrs. Gargala showed the appellant the gunshot wound in the victim's back, the appellant left the scene and went home. The appellant's wife and stepdaughter testified that he was not upset. The appellant returned to Chestuee Road and told the victim's family that the victim "got what he

deserved." The evidence is sufficient to show that the appellant intentionally killed the victim. Moreover, the procurement of a weapon; the cruelty of the killing in that the appellant fired two shots at the victim as he was driving away, striking him once in the back; the appellant's calmness immediately after the killing; the appellant's stating that the victim got what he deserved; and the appellant's motive for the killing, i.e., his being angry about the victim's hitting him in the face, sufficiently establish premeditation. We recognize that the time between the appellant's being hit in the face and his shooting the victim was extremely short. However, as stated previously, it was not necessary that the appellant's decision to kill pre-exist for any definite period of time. Ample circumstances exist in this case to support the jury's finding of premeditation. Therefore, the evidence is sufficient to support the conviction.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-22-